599 A.2d 1256

KENNETH D. MERIN, COMMISSIONER OF INSURANCE,
PLAINTIFF-APPELLANT, v. ROBERT MAGLAKI,
DEFENDANT-RESPONDENT.

Argued September 10, 1991—Decided January 8, 1992.

*Debbie J. Thompson,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Former Assistant Attorney General, and *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

No appearance was made on behalf of defendant.

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the scope of *N.J.S.A.* 17:33A–4(a), a provision of the New Jersey Insurance Fraud Prevention Act (the Act), *N.J.S.A.* 17:33A–1 to –14, and the civil penalties to be imposed for violations thereof pursuant to *N.J.S.A.* 17:33A–5(a). Specifically, we must determine the extent to which the Act penalizes a person who has submitted several false statements in support of a single fraudulent claim for insurance benefits. The Commissioner of Insurance (Commissioner) argues that each knowing and material false written statement presented in support of an insurance claim constitutes a separate violation of *N.J.S.A.* 17:33A–4(a) and, accordingly, each false submission subjects the claimant to a separate penalty pursuant to *N.J.S.A.* 17:33A–5(a). On the other hand, defendant, Robert Maglaki, contends that all of the false statements made in support of a single insurance claim constitute a single violation of *N.J.S.A.* 17:33A–4(a), and therefore regardless of the number of untrue statements submitted in support of an insurance claim, only one penalty should be imposed per claim.

The trial court disagreed with the Commissioner's interpretation of the Act and imposed a single penalty on defendant, who had submitted six falsified documents in support of a fraudulent claim for life insurance benefits. The Appellate Division affirmed. We now reverse.

We hold that the plain language of the Act as well as the legislative intent behind the statute support the Commissioner's interpretation. The Act authorizes a sanction for each material false statement knowingly submitted in support of a fraudulent claim for insurance proceeds that significantly enhances the credibility of or evidentiary support for the claim. Moreover, we hold that the civil penalties authorized by the Act are remedial in nature and do not constitute a second "punishment"

of Maglaki within the meaning of the Double Jeopardy Clauses of the federal and state constitutions.

## I

On June 30, 1986, Maglaki submitted a fraudulent claim to Prudential Insurance Company (Prudential) in an attempt to collect $300,000 in accidental-death benefits from two insurance policies on the life of his wife, Antonieta. Maglaki falsely claimed that Mrs. Maglaki had died in an automobile accident in the Philippines twelve days earlier. In fact, Antonieta Maglaki was alive.

In support of his fraudulent claim, Maglaki submitted six falsified documents: a claim form, an authorization to release information relating to his wife, a traffic-accident investigation report that purported to be a document prepared by the Manila Police Department, a certificate of death, a certificate of post-mortem examination, and a receipt for a burial permit. The last three submissions purported to be official documents from the Republic of the Philippines. All six documents represented that Mrs. Maglaki had died in an automobile accident in Manila on June 18, 1986. That each document contained false and misleading statements concerning the death of Antonieta Maglaki and the expenses surrounding her funeral and burial is undisputed. Each document also supported the false claim for accidental-death benefits presented by Maglaki.

On June 10, 1988, Maglaki pleaded guilty to a single count of third-degree attempted theft by deception in violation of *N.J.S.A.* 2C:5–1 and 2C:20–4 arising from his efforts to secure property, the life-insurance proceeds, to which he was not entitled. The court thereafter sentenced him to five-years probation, 500 hours of community service, and $530 in fines.

Subsequently, the Commissioner filed a civil suit seeking penalties and other relief from Maglaki, pursuant to *N.J.S.A.* 17:33A–4. The complaint set forth six separate counts and charged that Maglaki had committed six separate violations of

*N.J.S.A.* 17:33A–4, once for each fraudulent document submitted in support of his claim. The Commissioner asked the trial court to impose penalties totalling $30,000, $5,000 for each separate offense.

The trial court granted the Commissioner's summary judgment motion with respect to liability, but held that Maglaki's action constituted a single violation of the statute rather than six separate violations. The court therefore imposed a penalty of only $2,500.

The Appellate Division affirmed, in an unreported opinion, substantially for the reasons stated by the trial court. We granted certification, 126 *N.J.* 320, 598 *A.*2d 880 (1991).

## II

*N.J.S.A.* 17:33A–4 provides in pertinent part:

a. A person or a practitioner, violates this act if he:

(1) Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(2) Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or opposition to any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim * * *.

Penalties for violations of the Act are set forth in *N.J.S.A.* 17:33A–5 as follows:

a. If a person or practitioner is found by a court of competent jurisdiction, pursuant to a claim initiated by the commissioner, to have violated any provision of this act, the person or practitioner shall be subject to a civil penalty not to exceed $5,000.00 for the first violation, $10,000.00 for the second violation and $15,000.00 for each subsequent violation.

Construction of any statute necessarily begins with consideration of its plain language. *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987); *Renz v. Penn Cent. Corp.,* 87 *N.J.* 437, 440, 435 *A.*2d 540 (1981). Such language should be given its ordinary meaning, absent a legis-

lative intent to the contrary. *Town of Morristown v. Woman's Club*, 124 *N.J.* 605, 610, 592 *A.*2d 216 (1991); *Mortimer v. Board of Review*, 99 *N.J.* 393, 398, 493 *A.*2d 1 (1985); *Levin v. Township of Parsippany–Troy Hills*, 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980). The primary task for the Court is to "effectuate the legislative intent in light of the language used and the objects sought to be achieved." *State v. Maguire*, 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980) (footnote omitted). The Court fulfills its role by construing a statute in a fashion consistent with the statutory context in which it appears. *Waterfront Comm'n v. Mercedes–Benz*, 99 *N.J.* 402, 414, 493 *A.*2d 504 (1985).

The language of *N.J.S.A.* 17:33A–4(a)(1) indicates that the legislature intended to hold claimants liable for each false statement submitted in support of a fraudulent insurance claim. The statute could hardly be clearer in describing a violation to include submission of *"any* written or oral *statement as part of, or in support of* * * * *a claim* for payment or other benefit pursuant to an insurance policy * * *." *N.J.S.A.* 17:33A–4(a)(1) (emphasis added). Any doubts about the legislative intent to penalize each material statement submitted in support of a claim are dispelled by the Act's definition of "statement" as including "any writing, * * * proof of loss, * * * receipt, invoice, account, * * * bill for services, * * * hospital or physician records * * * or other evidence of loss, injury or expense." *N.J.S.A.* 17:33A–3(i). Clearly, the legislature focused its attention not on the claim itself but on the false statements presented in support thereof.

The words chosen by the legislature are deemed to have been chosen for a reason. *Gabin v. Skyline Cabana Club*, 54 *N.J.* 550, 555, 258 *A.*2d 6 (1969). In the Act, the legislature describes the offense as the submission of "statements," not "claims." Had the legislature intended to restrict the Act to fraudulent claims rather than false statements, it would have drafted the statute accordingly.

Congress addressed the distinction between "claims" and "statements" when drafting the False Claims Act, which penalizes submission of "a false or fraudulent claim for payment" in one provision, 31 *U.S.C.* § 3729(a)(1), and using "a false record or statement to get a false or fraudulent claim paid" in another, 31 *U.S.C.* § 3729(a)(2). Federal courts recognize the statutory distinction that Congress had drawn between a false statement and a fraudulent claim. See *United States v. Hill,* 676 *F.Supp.* 1158, 1174 (N.D.Fla.1987) ("a 'false statement' in a loan guarantee application is not a 'false claim.' ").

Moreover, that interpretation is consistent with the legislature's intent. Our courts have continually recognized that furtherance of legislative purpose is key to the construction of any statute. *State v. Tischio,* 107 *N.J.* 504, 511, 527 *A.*2d 388 (1987), *appeal dismissed,* 484 *U.S.* 1038, 108 *S.Ct.* 768, 98 *L.Ed.*2d 855 (1988). "In discerning that intent we consider not only the particular statute in question, but also the entire legislative scheme of which it is a part." *Kimmelman, supra,* 108 *N.J.* at 129, 527 *A.*2d 1368. The legislature unambiguously articulated its purpose behind passage of the Act: "The purpose of this act is to confront aggressively the problem of insurance fraud in New Jersey by facilitating the detection of insurance fraud [and] eliminating the occurrence of such fraud through the development of fraud prevention programs * * *." *N.J.S.A.* 17:33A–2. The Act's purpose is achieved largely through the imposition of civil penalties on each material false statement submitted in support of an insurance claim.

 Insurance fraud is a problem of massive proportions that currently results in substantial and unnecessary costs to the general public in the form of increased rates. In fact, approximately ten to fifteen percent of all insurance claims involve fraud. *New Jersey Dep't of Ins. 1989 Annual Report,* at 62–63. The Commissioner's interpretation of the Act reasonably and substantially effectuates the legislative intent to combat insurance fraud aggressively. We give substantial defer-

ence to the interpretation of the agency charged with enforcing an act. The agency's interpretation will prevail provided it is not plainly unreasonable. *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984).

The Commissioner correctly asserts that each knowing and material false statement enhances a fraudulent claim, making the danger of payment more likely. Insurers often require a claimant to file several documents as supporting proof of a claim for benefits. *See* 13A *Couch on Insurance 2d* chs. 49, 49A (Rev.Ed.1982). Claimants frequently must present a "proof of loss" in the form of a detailed factual statement or statements to justify claims for benefits. *See id.* § 49A:21. Each additional statement further supports the credibility of the claim. Therefore, a claimant who makes a fraudulent claim in an initial documentation may well have subsequent opportunities to rectify previous misrepresentations when the insurer calls for further proof of loss. Someone less intent on carrying out an insurance scam could use those opportunities to back out of his or her scheme. On the other hand, the person who persists in asserting a fraudulent claim by continuing to submit material misrepresentations compounds the evil that the legislature seeks to eliminate with the Act. Construction of the Act to penalize claims rather than component statements would produce the inequitable result of placing the State in the same position with respect to Maglaki as it would be in with respect to a claimant who makes an initial false statement and then recants. Such a result fails to effectuate the legislature's intent that persons who file several false statements should be punished for each instance of prohibited conduct.

The legislature's intent to impose a civil penalty for each "knowing and material" statement made in support of a false insurance claim is clear on the statute's face. Moreover, the analysis we apply today is consistent with the Court's construction of other civil statutes analogous to the Act.

In *In re Suspension of DeMarco*, 83 *N.J.* 25, 414 *A.*2d 1339 (1980), a doctor was charged with causing ninety-two cases of hepatitis by using improperly sterilized syringes on his patients. The Court upheld the revocation of the doctor's license for his having endangered the health and lives of his patients, *id.* at 29, 414 *A.*2d 1339, and a $20,000 fine pursuant to *N.J.S.A.* 45:9–22. That statute provides in pertinent part:

> any person * * * who violates any of the provisions of this chapter or any supplement thereto, shall be liable to a penalty of two hundred dollars ($200.00), for the first offense * * *.

*N.J.S.A.* 45:9–26, which has subsequently been repealed, provided the following penalties for subsequent violations of the statute:

> In case a person shall, after conviction of any violation of this chapter or any supplement thereto, be again convicted of another violation thereof or of continuing the violation for which such offender was previously convicted, such offender shall be liable to a penalty of five hundred dollars * * *.
>
> * * * * * * * *
>
> In case a person shall, after two convictions of violations of this chapter or this act, be again convicted of another violation thereof or of continuing the violation or violations for which such offender was previously convicted such offender shall be liable to a penalty of one thousand dollars * * *.

Of the total penalty imposed on DeMarco, $18,400 reflected a $200 fine for each of the ninety-two cases of hepatitis. *Id.* at 29–30, 414 *A.*2d 1339. The Appellate Division reduced DeMarco's fine to $200, reasoning that *N.J.S.A.* 45:9–22 permitted a single penalty for the first conviction regardless of the number of violations involved. *Id.* at 30, 414 *A.*2d 1339. We rejected that reasoning, finding instead that the $200 penalty applied to each of the acts in violation of the statute that comprised the first offense. *Id.* at 34–35, 414 *A.*2d 1339.

In support of our holding we noted the "clear legislative intent to deter and punish physicians who would risk the health and lives of patients through gross negligence." *Id.* at 30, 414 *A.*2d 1339. We determined that to limit the total penalty to "$200 for 92 life-threatening violations would be to drain [the statute] of all strength." *Id.* Similarly, to limit the Commissioner to recovery of a single penalty regardless of the number

of false statements submitted in support of a bogus claim for insurance proceeds would unnecessarily weaken deterrence of fraudulent activity. See *State v. Elmwood Terrace, Inc.*, 85 *N.J.Super.* 240, 251, 204 *A.*2d 379 (App.Div.1964) (landlord guilty of seventeen statutory violations for failing to provide required heat to seventeen apartments in violation of municipal ordinance. To hold otherwise "would emasculate the ordinance as a penal deterrent"); *cf. Caldwell Terrace Apartments, Inc. v. Borough of Caldwell*, 224 *N.J.Super.* 588, 592–93, 541 *A.*2d 221 (App.Div.1988) (landlord who had failed to put smoke detectors in common areas of 110–unit building found to have committed one violation of ordinance prohibiting submission of "any material misstatement of fact" on application certifying that it had complied with "all health, safety and housing laws").

The issue in those cases was the best method of construing the statutes in order to effectuate legislative intent. Here, the legislature's intent is to prevent insurance fraud. That intent is best effectuated by holding that *N.J.S.A.* 17:33A–4(a) supports imposition of a penalty for each false statement submitted in support of a fraudulent claim for insurance proceeds, provided that the false statement is material and significantly enhances the credibility of or evidentiary support for the claim. Of course, it would be unreasonable to increase the penalty for each instance that the same misrepresentation appears in a single document or for false assertions that substantively repeat information contained in other misrepresentations in the same document. We are confident, however, that the Commissioner does not seek to stretch the limits of the Act that far.

Furthermore, *N.J.S.A.* 17:33A–5(a) provides that the trial court has the discretion to set the specific amount of the penalty. There are no fixed mandatory penalties established by the statute. Section 5(a) provides that violations of the Act are to be punished by imposition of a civil penalty *not to exceed* $5,000 for the first violation, $10,000 for the second violation, and $15,000 for each subsequent violation. The trial court

must set the penalty in its discretion. Thus, the trial court retains the discretion to decline to impose penalties for false statements that are unduly duplicative or that do not significantly contribute to the authenticity of the claim.

Maglaki submitted six documents that he knew were false. Three of the submissions purported to be official documents of the Republic of the Philippines. Such evidence discloses a fairly complex, sophisticated, and well-thought-out insurance-fraud scheme that necessarily needed the assistance of accomplices overseas. Each statement appears on its face to be material to the claim, and to have enhanced the credibility of the claim, and to have exacerbated Prudential's exposure to potential liability. We hold that under the Act a civil penalty may be imposed on Maglaki for each of the knowing and material false statements he submitted which significantly enhanced his fraudulent claim.

## III

■ Prior to the imposition of civil penalties under the Act, Maglaki was convicted of one count of criminal attempted theft by deception under *N.J.S.A.* 2C:20-4. The parties dispute whether the instant proceeding and the prior criminal proceeding concern the same conduct. We need not decide that issue, however, because even if the two proceedings did involve the same conduct, under the analysis established in *United States v. Halper*, 490 *U.S.* 435, 109 *S.Ct.* 1892, 104 *L.Ed.*2d 487 (1989), and *In re Garay*, 89 *N.J.* 104, 444 *A.*2d 1107 (1982), the imposition of civil penalties under the Act does not constitute a second "punishment" within the meaning of the Double Jeopardy Clauses of the federal and state constitutions.

■ Generally, double jeopardy protections, which prohibit multiple punishments for a single offense, are not applicable to civil suits. *In re Garay, supra,* 89 *N.J.* at 111, 444 *A.*2d 1107. The mere labelling of a penalty as "civil," however, does not foreclose an examination of whether in substance the penalty

imposed is "punishment" rather than "remedial" in nature. But "[w]here the legislature has labelled the penalty civil, the expression of legislative purpose is accorded substantial weight." *Id.* at 112, 444 *A.*2d 1107 (citing *United States v. Ward*, 448 *U.S.* 242, 248–49, 100 *S.Ct.* 2636, 2640–41, 65 *L.Ed.*2d 742, 749 (1980)).

In *Halper*, the United States Supreme Court articulated standards for determining whether a "civil penalty" constitutes punishment for the purpose of double jeopardy analysis. Halper submitted sixty-five fraudulent claims to the federal government through Medicare for payment of medical services. In each statement defendant deliberately overstated the amount of reimbursement to which he was entitled. As a result, Halper succeeded in securing $585 in overpayments from the government. 490 *U.S.* at 437, 109 *S.Ct.* at 1895–96, 104 *L.Ed.*2d at 494.

Halper was convicted of sixty-five counts of violating the criminal false-claims statute, 18 *U.S.C.* § 287, as well as sixteen counts of mail fraud. He was sentenced to two-years imprisonment and fined $5,000 on the criminal charges. *Id.*, at 438, 109 *S.Ct.* at 1896, 104 *L.Ed.*2d at 494.

Thereafter, the government brought suit under the False Claims Act, 31 *U.S.C.* §§ 3729–3731, seeking civil penalties. The District Court granted summary judgment for the government on the issue of defendant's liability. *Id.* at 438, 109 *S.Ct.* at 1896, 104 *L.Ed.*2d at 495. The False Claims Act provided that a person in violation was "liable to the United States Government for a civil penalty of $2,000, an amount equal to 2 times the amount of damages the Government sustains because of the act of that person, and the costs of the civil action." *Ibid.*

Having violated the statute sixty-five times, Halper was theoretically subject to a statutory penalty of more than $130,-000. *Ibid.* Halper argued that *any* penalty would constitute a second punishment for the same conduct that served as the

basis of his criminal conviction and sentence. The Supreme Court rejected his argument.

Because the Double Jeopardy Clause protects against multiple "punishments" only for the same conduct, the central issue in a double-jeopardy challenge of this nature is whether the penalties imposed amount to a "punishment," thereby triggering constitutional protection, or are only "remedial" in nature and outside the scope of the Double Jeopardy Clause. See *id.* at 441–42, 109 *S.Ct.* at 1897–98, 104 *L.Ed.*2d at 497. The Court concluded that "a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." *Id.,* at 448–49, 109 *S.Ct.* at 1901–02, 104 *L.Ed.*2d at 502.

■ However, a civil penalty does not rise to the level of "punishment" for double-jeopardy purposes merely because it can be imposed in an amount in excess of the Government's actual damages. *Id.,* at 442, 109 *S.Ct.* at 1898, 104 *L.Ed.*2d at 497; *accord United States ex rel. Marcus v. Hess,* 317 *U.S.* 537, 63 *S.Ct.* 379, 87 *L.Ed.* 443 (1943). As the Court in *Halper* explained: "the Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas, such as reasonable liquidated damages * * * without being deemed to have imposed a second punishment for the purpose of double jeopardy analysis." 490 *U.S.* at 446, 109 *S.Ct.* at 1900, 104 *L.Ed.*2d at 500; *see also Marcus, supra,* 317 *U.S.* at 548–49, 63 *S.Ct.* at 386–87, 87 *L.Ed.* at 452 (statute allowing recovery of double damages plus a specific sum for collusive bidding not punishment because it "protect[ed] the government from financial loss" as opposed to "vindicat[ing] public justice").

In addition, the government may recover amounts that represent costs other than actual damages from the prohibited

activity. *Halper, supra,* 490 *U.S.* at 444–45, 109 *S.Ct.* at 1899–1900, 104 *L.Ed.*2d at 499. A penalty may constitutionally include "not merely the amount of the fraud itself, but also ancillary costs, such as the costs of detection and investigation, that routinely attend the Government's efforts to root out deceptive practices * * *." *Id.,* at 445, 109 *S.Ct.* at 1900, 104 *L.Ed.*2d at 499. The only significant limitation *Halper* placed upon governmental recovery was in "the rare case * * * where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused." *Id.,* at 449, 109 *S.Ct.* at 1902, 104 *L.Ed.*2d at 502. Civil penalties, therefore, will not survive constitutional scrutiny in the "stark situation" in which the State's recovery is "exponentially greater than the amount of the fraud" and "many times the amount of the Government's total loss." *Id.,* at 445, 109 *S.Ct.* at 1900, 104 *L.Ed.*2d at 499.

The *Halper* Court recognized that it "would be difficult if not impossible in many cases for a court to determine the precise dollar figure at which a civil sanction has accomplished its remedial purpose * * * but beyond which the sanction takes on the quality of punishment." *Ibid.* The process of evaluating whether sanctions constitute punishment inevitably involves "unavoidable imprecision." *Ibid.*

The *Halper* Court found that the disparity between the government loss of $585 plus the lower court's estimation of $16,000 in governmental costs associated with the case and the $130,000 in sanctions sought from Halper was so great as to constitute a second punishment for double jeopardy purposes. *Id.,* at 452, 109 *S.Ct.* at 1903–04, 104 *L.Ed.*2d at 504.

The analysis set forth in *Halper* is similar to that undertaken in *Garay, supra,* 89 *N.J.* at 108, 444 *A.*2d 1107. In *Garay,* defendant doctor filed fifty-eight false claims for Medicaid reimbursements for services that he did not perform. He received a total of $1,290.20 on these fraudulent claims. *Ibid.*

Defendant was convicted of twenty counts of Medicaid fraud, sentenced to a suspended eighteen-month prison term, and fined $9,500 as well as having his license revoked. *Id.* at 108–09, 444 *A.*2d 1107. After the criminal conviction, the State began proceedings to recover $121,603.41 in civil penalties under *N.J.S.A.* 30:4D–17(e). *Id.* at 109, 444 *A.*2d 1107. The amount sought included a $2,000 penalty for each fraudulent claim submitted by the doctor. *Id.* at 110, 444 *A.*2d 1107.

We held that the penalties were civil in nature and did not constitute a punishment for double jeopardy purposes. *Id.* at 111, 444 *A.*2d 1107.

We concluded that the penalties imposed on Garay were civil in nature because the

obvious purpose of the penalty provision * * * is to recover the costs of fraud investigations and of the legal proceedings required to ensure repayment. These penalties are in effect liquidated damages for the State's costs. [T]hose costs includ[e] the investigative staff necessary to uncover respondent's wrong- doing [and] preparation of * * * administrative proceedings and appeals * * *. [T]he State may properly seek to recover from those who have defrauded it the costs of the overall investigative effort necessitated by the persistence of * * * fraud. [*Id.* at 114, 444 *A.*2d 1107].

We concluded our analysis in *Garay* by holding that a civil penalty imposed after a criminal conviction, but based on the same conduct, "must be tested for reasonableness as applied to the specific facts involved." *Id.* at 115, 444 *A.*2d 1107. The approach taken in *Garay* was implicitly approved by the subsequent holding in *Halper.*

In the instant matter, the Commissioner seeks $5,000 in damages for each of Maglaki's violations of the Act. We hold that the amount sought is rationally related to the expenses incurred by the government in the course of its investigation and prosecution of Maglaki's fraudulent claim. In *Halper* the civil penalties imposed were $130,000 for false claims of $585 and a cost of $16,000 to the government; in *Garay* the civil penalties imposed were $121,603.41 against fraudulent Medicaid claims of $1,290.20. That case was remanded for the trial court to assess the reasonableness of the government's cost.

We are not troubled by the fact that the State has not proven the exact extent of its damages nor provided precise calculations to support the penalties imposed. The Act established a Division of Insurance Fraud Prevention within the Department of Insurance. The Division assists the Commissioner in investigating allegations of insurance fraud and in developing and implementing programs to prevent future frauds and abuse. *N.J.S.A.* 17:33A–8. The Division has full-time supervisory and investigative personnel as well as clerical and other staff to fulfill its responsibilities under the Act. All the costs associated with those activities represent expenses related to investigating fraudulent claims, like that of Maglaki's. Furthermore, all revenues from civil penalties imposed pursuant to the Act are credited to the New Jersey Automobile Full Insurance Underwriting Association Auxiliary Fund, see *N.J.S.A.* 17:33A–5(b), which is used to defray costs associated with government insurance programs. For the State to provide precise calculations of the costs associated with investigating and prosecuting a particular attempted insurance fraud would be difficult, if not impossible. Yet, that the State incurs a significant financial burden in uncovering and rectifying such activities is undeniable. In such circumstances, penalties act, in effect, as liquidated-damages clauses, with the purpose of avoiding the imposition of unnecessarily wooden restrictions on the State's right to recover damages. *See Rex Trailer Co. v. United States,* 350 *U.S.* 148, 76 *S.Ct.* 219, 100 *L.Ed.* 149 (1956); *Garay, supra,* 89 *N.J.* at 114, 444 *A.*2d 1107. We are confident that the State is not seeking penalties greatly in excess of the sizable costs incurred in the course of rooting out and prosecuting Maglaki's fraudulent behavior.

Nor do we find decisive the fact that Maglaki was not successful in securing insurance proceeds. The penalties permitted by the Act are not designed to remedy direct monetary damage to the insurer. Rather, as explained above, remedial civil penalties compensate the State for the costs incurred as a result of investigating and prosecuting insurance fraud.

While the amount of penalties to be imposed is for the trial court to determine, we conclude that the maximum amount sought by the Commissioner, $30,000, is rationally related to the amount of Maglaki's attempted fraud and the expenses presumed to have been incurred by the State in investigating his behavior. We hold, therefore, that any penalty imposed, up to the maximum amount authorized by the statute, would not constitute punishment for double jeopardy purposes.

## IV

Because the lower courts erred in concluding that defendant had committed a single violation of the Act, the judgment of the Appellate Division is reversed. The case is remanded to the trial court for imposition of penalties for each false statement submitted by Maglaki which significantly enhanced his claim.

CLIFFORD, J., dissenting.

Acknowledging at the outset that the appeal presents a close call and that the Court's approach assuredly is plausible, I nevertheless would affirm substantially on the basis of the Appellate Division's opinion, which in turn relied on the trial court's letter opinion. Unlike the majority, I do not find in the plain language of the New Jersey Insurance Fraud Prevention Act (the Act), *N.J.S.A.* 17:33A–1 to –14, the answer to the question presented—whether, when a person commits multiple violative acts in support of a single fraudulent insurance claim, the civil penalty under the Act should be based on one violation or on the number of acts committed.

Because the Act is a civil penal statute, it must be construed narrowly. *See In re Suspension of DeMarco*, 83 *N.J.* 25, 36, 414 *A.*2d 1339 (1980). The pertinent sections, *N.J.S.A.* 17:33A–4 and –5, are not so unambiguous as to require a finding that each submission of material false information in support of an insurance claim constitutes an independently punishable act. The Legislature has demonstrated that it knows full well how

to do what it avoided doing here, namely, to craft a statute that imposes multiple penalties for what might appear to be a single offense. See, *e.g.*, *N.J.S.A.* 56:8–2.8, the Consumer Fraud Act "going out of business sale" provision, which authorizes penalizing a merchant separately for each day in violation of that provision: "For any person in violation of this act, each day in violation shall constitute an additional, separate and distinct violation." Moreover, my understanding of the law on fractionalization of offenses leads me to conclude that courts will impose multiple penalties only when the offender has committed separate acts that cause separate injuries, in light of the violation as defined in the statute under review. *See Caldwell Terrace Apartments v. Borough of Caldwell,* 224 *N.J.Super.* 588, 592–93 & n. 2, 541 *A.*2d 221 (App.Div.1988). This defendant's conduct falls short of that requirement.

I read the Act as providing that the making of a fraudulent insurance claim amounts to a single violation, no matter how many documents are submitted in support of that claim. The Act itself authorizes substantial penalties, ranging up to $5000 for the first violation, up to $10,000 for the second violation, and up to $15,000 for each subsequent violation. Because in imposing penalties a trial court is accorded a generous measure of discretion that can take into account the number and materiality of fraudulent statements supporting the claim, I would affirm the Appellate Division's holding that the trial court properly imposed one penalty rather than six.

HANDLER and POLLOCK, JJ., join in this dissenting opinion.

*For affirmance* —Justices CLIFFORD, HANDLER and POLLOCK—3.

*For reversal and remandment* —Chief Justice WILENTZ, and Justices O'HERN, GARIBALDI and STEIN—4.