710 A.2d 1072 (1998)
311 N.J. Super. 660
ALLSTATE INSURANCE COMPANY, Plaintiff,
v.
Idabells LOPEZ, et al., Defendants.
Superior Court of New Jersey, Law Division, Morris County.
Decided February 6, 1998.
*1073 Gordon Graber and Robyn Ann Valle, Morristown, for plaintiff (Sullivan & Graber, attorneys; Ms. Valle, on the brief).
Joseph A. Massood, Wayne, for defendants Melania Rodriguez, Yrsi Perez, Maria Rodriguez-Perez, Euclides DelRosario and Ana Benitez (Massood & Covello, attorneys; Mr. Massood, on the brief).
William Figundio III, for defendants Jose Bergos, Sandra Maria and Victor Pena (Weiner Ryan Brogan & Associates, attorneys, Passaic; Mr. Figundio, on the brief).
Jonathan G. Williams, Chatham, for defendant Clifton Medical Imaging Center (Epstein, Epstein, Brown & Bosek, attorneys; Mr. Williams, on the brief).
VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).
Plaintiff, Allstate Insurance Company ("Allstate"), brings this declaratory judgment action against 434 defendants (insureds, drivers, passengers and health care providers) alleging insurance fraud. Allstate states that this case involves what is believed to be part of the largest automobile-accident fraud ring documented in United States history.[1] The alleged participants in this ring have instituted personal injury lawsuits and arbitration proceedings claiming damages for bodily injury, either individually or through assignees, for personal injury protection ("PIP") and other benefits and damages. Allstate seeks to stay all ongoing and future lawsuits in various counties and arbitration proceedings, but not discovery, involving these defendants, pending the resolution of this declaratory judgment action.

ALLSTATE'S ALLEGATIONS
The fraud ring operates primarily in the cities of Passaic and Paterson, New Jersey (Passaic-Paterson fraud ring). The ring members' purpose is to defraud Allstate and other automobile insurers. Allstate alleges that the members' method of achieving that purpose is to stage accidents involving major "players" or operatives, usually the owner and/or driver of the car who engage in frequent repeat performances, and bit players, the passengers, whose participation often is limited to a one-time appearance.[2]
The main players in the fraud ring are usually associated with four or more accidents in a relatively short period of time. Almost all of these alleged accidents involve two vehicles filled to capacity. The police are called to the scene in order to create a *1074 record of the incident. Generally, the vehicles appear to have minor damage; the driver or owner often attempts to offer preexisting damage as evidence to the responding officer, and later to the insurance company, that the accident occurred. The impact between the vehicles, to the extent that it occurred at all, occurs most often in a twenty-five mile-per-hour zone; frequently the drivers admit that one or the other vehicle was stopped or travelling at a minimal rate of speed.
Although the players often complain of pain at the accident scene, the responding police officer rarely discerns visible injuries. No one is bleeding, bruised or unconscious at the scene. None of the defendants named in this lawsuit sustained a fracture as a result of any of the alleged accidents. Rather, the participants, with the notable exception of the at-fault driver, file claims for extensive treatment and testing related to soft-tissue injuries. Due to the subjective nature of this type of injury, the players are able to feign injury without much risk of detection.
For the most part, Allstate alleges that the players design each accident to appear as if it were caused solely by the negligence of a single insured driver. Thus, ring members consistently employ predictable factual scenarios that serve as a blueprint and ensure: first, that the at-fault participant is easily recognizable, and, second, that the participants are not in danger of actual injury. These scenarios include: low-speed rear-end hits; intersection accidents caused by a driver's acknowledged failure to obey a stop sign; impacts caused by a driver's failure to yield when exiting from a parking lot, driveway or parking spot; and side-swipes of a stopped vehicle caused by the other driver's wide turn. These fact patterns generally foreclose liability questions and are allegedly designed to encourage insurance companies to settle claims quickly, without litigation.

SUMMARY OF FACTS
Because the facts in the original filed opinion are so detailed and lengthy, they have only been summarized for the purpose of the reported opinion.
The accidents that are at issue in this lawsuit can be analyzed most readily with reference to three alleged major players in the Passaic-Paterson fraud ring.
A. The Maria Vinales Connection
On July 26, 1995, Maria Vinales (also known as Maria Vinalls) was driving a car owned by Pablo Melendez when she rear-ended a car driven by Ysebia Reynoso. On August 14, 1995, defendant Vinales was driving a 1981 Buick when she rear-ended a 1992 Chevrolet driven by Elizabeth Escabi. On November 19, 1995, Vinales was driving Sonia Pabon's 1982 Plymouth when she rear-ended a car driven by Jose A. Maldonado. On December 18, 1995, Vinales was driving a car owned by Pedro Verdejo when she allegedly made a wide right turn and hit the oncoming vehicle driven by Nancy Jiminez. On January 31, 1996, Vinales was again driving Pabon's Plymouth when she rear-ended a vehicle driven by Melania Rodriguez and owned by Andy Catinchi. On February 17, 1996, Vinales was driving a car belonging to Ramon Hernandez when it was bumped by a car making a wide right-hand turn driven by Luis A. Vigo. On May 26, 1996, Vinales was driving a car owned by Joel Mendez when she rear-ended a car driven by Michele Romao. Therefore, Vinales apparently caused seven accidents within ten months.
Allstate contends that the drivers and passengers of the other cars involved in these incidents are not innocent victims; they, too, are active participants in the scheme to commit fraud.
Elizabeth Escabi (also known at Escabi-Townsend), who was involved in the August 14, 1995 incident with Vinales when she was rear-ended by the Vinales vehicle being driven by Angel R. Vasquez, is currently being investigated for that accident as well as two other accidents. Vasquez, himself, is under investigation for his involvement in five additional accidents.
Andy Catinchi, the owner of the car involved in the January 31, 1996 Vinales incident, is under investigation for losses sustained in twelve accidents that occurred between August 3, 1995 and April 1, 1996.
*1075 Joel Mendez, owner of the car driven by Vinales in the May 26, 1996 incident, is currently being investigated by Allstate for his involvement in twelve accidents that occurred between February 3, 1996 and July 21, 1996.
A familiar player involved with Mendez is Santos Gonzalez. Gonzalez was involved in three of the Mendez incidents while either Gonzalez was driving the Mendez vehicle or Mendez was driving the Gonzalez vehicle. Gonzalez is being investigated for his involvement in thirteen accidents that occurred between November 7, 1995 and August 10, 1996. In an accident which occurred on July 14, 1997, Gonzalez rear-ended a vehicle driven by Leonor Agosto. Agosto, herself, is currently under investigation by Allstate for her involvement in five accidents between February 25, 1996 and July 14, 1996.
Michele Romao, connected to the May 26, 1996 incident with Vinales, is currently under investigation by Allstate for her involvement in three other suspicious accidents which occurred between April 30, 1996 and July 13, 1996. In two accidents, Ms. Romao rear-ended vehicles and in one incident, Ms. Romao's car being driven by Julian Martinez, was rear-ended by another vehicle.
Nancy Jiminez (also known as Nancy Jimenez) was side-swiped by a car driven by Vinales and owned by Pedro J. Verdejo. Jiminez is being investigated by Allstate for her involvement in accidents that occurred on December 27, 1995 and November 3, 1996.
Luis Vigo was involved in the February 17, 1996 Vinales incident when he made a wide right-hand turn and side-swiped a car, stopped at a stop sign, driven by Maria Vinales and owned by Ramon Hernandez. Vigo is currently under investigation by Allstate for six other incidents that occurred between September 17, 1995 and March 10, 1996.
B. The Sonia I. Pabon Connection
Sonia I. Pabon or her vehicle has been involved in eight incidents, including the accident on November 19, 1995, in which Maria Vinales was driving Pabon's vehicle when she rear-ended a car driven by Jose Maldonado and an accident on February 10, 1996, when Pabon was driving a vehicle owned by Idabells Lopez, when she made a wide right turn and struck a vehicle driven by Luis Vigo.
Idabells Lopez is currently under investigation by Allstate for her involvement in seven other accidents that occurred between February 4, 1996 and April 1, 1996.
C. The "Siber Rodriguez" Connection
The "Siber Rodriguez" connection is a misnomer since, in fact, the real Siber Rodriguez has never been involved in any automobile accidents: some other person or persons have been using his name and drivers license number. As a result, his name is linked to eight accidents in a seven-month period.
The real Siber Rodriguez testified that he has driven a car one time in this State and that was on the day he visited the Department of Motor Vehicles (DMV) to obtain a drivers license. As Rodriguez entered the DMV office on that day, he was approached by an individual who offered to help him obtain a driver's license. The individual accompanied Rodriguez inside the DMV and escorted him to the various stations to sign the paperwork. At his examination, under oath, Rodriguez identified Jose Nazario from an array of photographs as the person who "helped" him through the licensure process. Jose Nazario (also known as Orlando Figueroa) is believed to be a major ring-leader in another fraud ring and is being investigated for his involvement in nine accidents between June 5, 1995, and February 20, 1996.
Siber Rodriguez examined the police reports for the accidents in which he was alleged to have been involved. Under oath, he denied involvement in any of those accidents. Rodriguez also provided Allstate with an investigation report issued by the Passaic Police Department. That report reveals that a summons was issued to Valeriano R. Martinez, identified by other parties involved as Virgilio Martinez, for the fraudulent use of a driver's license issued to Siber Rodriguez.
The impersonator "Siber Rodriguez" is a purported member of the Passaic-Paterson fraud ring and has been linked to eight accidents in a seven-month period. Several of these accidents involve other major operatives *1076 of the fraud ring. Further, the alias name of "Orlando Figueroa" has major links to the Passaic-Paterson fraud ring. Specifically, that name has been linked to nine accidents in a nine-month period.
Orlando Figueroa appears to be a false persona created to defraud insurance companies. On September 7, 1995, the Paterson Detective Bureau arrested Jose P. Nazario for producing false identification indicating that he was Orlando Figueroa. Jose Nazario was convicted of knowingly giving false information to a law enforcement officer, in violation of N.J.S.A. 2C:28-4a.
Jose Nazario is alleged to be a major player in the Passaic-Paterson fraud ring in his own right. Another insurer, Camden Fire Insurance Company, has filed an action entitled Camden Fire Insurance Company v. Brown, Docket No. MRS-L-1035-96, in which it linked Jose Nazario to eight accidents in a four-month period spanning from January to April 1995. Together, Jose Nazario and Orlando Figueroa are responsible for eighteen accidents in a fourteen-month period.
The extent of the claimed fraudulent activity being systematically engaged in by the claimants, who are seeking to financially benefit from non-existent injuries allegedly sustained as a result of staged accidents, is of enormous and far-reaching proportions. Any inquiry into the accidents and the numerous participants reveals connections that could easily lead the court and jury to the conclusion that these accidents were staged. The players become familiar figures but their roles change. Because of these ever-changing roles, detection becomes much more difficult, even with the abundant resources devoted by Allstate in its effort to investigate and stop this fraud.

I.

ALLSTATE'S BASIS FOR RELIEF
Because the accidents and the participants in the aforesaid accidents fit within the fraud profiles, Allstate seeks to stay all arbitrations and lawsuits arising from these accidents. Counsel for the only eight defendants who oppose this motion assert that they have an unequivocal right to proceed with their personal injury lawsuits. Except for the conclusionary certifications of four defendants, there is no competent evidence, pursuant to R. 1:6-6, by the other 426 defendants in opposition to Allstate's motion. At this stage of the proceedings these certifications do not overcome the factual allegations of fraud. More than 400 other defendants have not opposed a stay of their personal injury lawsuits or arbitrations.
The underlying declaratory judgment action asserts, generally, that defendants were part of a conspiracy to commit fraud relating to a number of automobile accidents and filing claims arising out of those accidents. The evidence presented strongly suggests that many of the non-medical provider defendants, who lived at the same address where some of the defendant drivers lived, were involved in various ways in a number of automobile accidents. Most involved circumstances that could be described as suspicious. Indeed, there are circumstances from which it could reasonably be concluded that the impact was intentionally caused by the driver of the vehicle in which the personal injury plaintiffs were drivers and/or passengers. In addition, many of the injured were diagnosed and treated in essentially the same manner by the same health care providers.
Here, again, the number of accidents in which other parties have been involved and the interrelationships between the parties and these accidents defies chance and bespeaks complicity and culpability. The fact that three defendants were involved in twelve accidents within nine months,[3] in and of itself, raises serious questions of potential fraud. Almost no one is involved in that many accidents during his or her lifetime. The mathematical odds that one person would be involved in twelve accidents within nine months is so ridiculously high that it defies the imagination.
Judicial economy, uniformity in result, and the principles of the entire controversy doctrine dictate that all matters arising *1077 out of the accidents listed in Allstate's Complaint be stayed for trial and arbitration, but not discovery, pending resolution of the declaratory judgment action. A stay will promote the Legislature's clear mandate to the insurance industry under the New Jersey Insurance Fraud Prevention Act ("the Act"), N.J.S.A. 17:33A-1 to -15, to fight fraud aggressively, while enabling Allstate to carry out the requirements set forth in the Act and assert statutory defenses and counterclaims provided for in the Act which cannot be considered in the arbitration forum.
A stay will not prejudice the defendants. Rather, a stay will maintain the status quo while the coverage issues are litigated. Any hardship to the defendants is minimal and is more than outweighed by the irreparable harm Allstate will otherwise suffer if a stay is not granted. These considerations provide the legal basis for Allstate's right to injunctive relief. See Crowe v. De Gioia, 90 N.J. 126, 447 A.2d 173 (1982).
Absent a stay, Allstate argues it will suffer irreparable harm. Denial of a stay would also require Allstate to make individual applications in hundreds of actions for a stay of personal injury lawsuits. Millions of dollars in fraudulent judgments may be obtained against it and its putative insureds. It will be required to present extensive duplicative testimony from numerous expert and fact witnesses in each action to prove its case. The inevitable outcome of this burden will be a backlog in both the arbitration and Superior Court systems. In addition, if Allstate is forced to present its case in piecemeal fashion, the true nature and extent of the fraudulent activity will be minimized and perhaps ignored; such a result would work a grave injustice on Allstate, as well as every citizen of this State who pays an insurance premium for the legitimate purpose of obtaining coverage against real accidental injury.

II.
The voiding of an insurance policy ab initio does not necessarily preclude innocent passengers from recovering PIP benefits. Dillard v. Hertz Claim Management, 277 N.J.Super. 448, 650 A.2d 1 (App.Div.1994), aff'd o.b., 144 N.J. 326, 676 A.2d 1065 (1996); Fisher v. New Jersey Auto. Full Ins., 224 N.J.Super. 552, 540 A.2d 1344 (App.Div. 1988). Allstate asserts that Fisher does not apply here because these defendants are not innocent claimants, as a result of the misrepresentations and their participation in a broader conspiracy to commit fraud against Allstate. The first issue thus becomes whether the claims asserted by the defendants implicate a coverage question to be decided by the court, or whether they are questions to be determined by an arbitrator. At issue, also, is whether a declaratory judgment action is the appropriate method for determining the issues presented here.
Counsel for the defendants assert that they have a right to arbitrate their claim. While none of the parties has attached a copy of the insurance policies, it is assumed that the policies provide the claimants with the option of submitting their claims to arbitration. N.J.S.A. 39:6A-5c provides that all automobile insurers "shall provide any claimant with the option of submitting a dispute under this section to binding arbitration." Presumably, the arbitrator could consider the question of fraud as it pertains to the happening of the accident or with respect to the nature and extent of the injuries. See Ohio Cas. Ins. Co. v. Benson, 87 N .J. 191, 432 A.2d 905 (1981). However, this litigation goes far beyond that issue and brings into play the question of coverage; that is, whether these claimants and the other parties to the suit (including the drivers and owners) are covered at all under the policies of insurance that were issued to these insureds.
While the defendant health care providers argue that the sole issue is whether the policy is void ab initio, the real issue is whether the policy is void with respect to all of the claimants and the insured because of the conspiratorial nature of the fraud that is alleged here. Moreover, the fraud allegedly committed here could go to the issue of whether the policy is void ab initio if it could be concluded that the policy was purchased in an effort to perpetrate the fraud that has been alleged. In any event, the claims are not simply that the insureds are not covered; rather, plaintiffs also contend that the health care claimants are not covered as well because *1078 they participated in the fraud, which is a hotly contested issue. The coverage question should be determined before there is an arbitration since the arbitration issue would probably be moot were it determined that there is no coverage for these claimants as well as the insured. Significantly, no health care provider appeared in opposition to this motion.
This court believes that the declaratory judgment route is appropriate for the resolution of the issues that are raised by these pleadings. It would permit the consolidation of a number of claims and have them resolved in one action. All of the parties to the alleged conspiracy would be before the court and discovery would be facilitated by having all of the facts elicited in one litigation.
As a result of the multitude of accidents in which the defendants in this action have participated, numerous claims have been submitted to the jurisdiction of the American Arbitration Association ("AAA") for adjudication. In addition, the participants in these accidents have filed lawsuits for bodily injury damages in the Superior Court of New Jersey in Essex, Passaic, Hudson, Bergen and Middlesex counties. Normally, a stay of these personal injury lawsuits should be heard by a Superior Court judge in the county where that action is pending. R. 4:52-6. Because of the complex nature of this and other fraud cases, the Assignment Judges of the various counties have authorized this court to consider stays in cases filed in their counties. Justice dictates that this declaratory action be heard first in the Superior Court, the legislatively-designated forum, in Morris County.

III.
Allstate contends that the entire controversy doctrine mandates that all arbitrations be stayed so that all the claims can be adjudicated in a single action in the Superior Court. New Jersey has long held a strong commitment to the entire controversy doctrine. The purposes of that doctrine are: first, to effectuate the complete and final disposition of a dispute through the avoidance of piecemeal decisions; second, to accord fairness to all parties to the action and those with a material interest in the action; and third, to enhance efficiency, reduce delay, and avoid waste. Cogdell v. Hospital Center at Orange, 116 N.J. 7, 15, 560 A.2d 1169 (1989); see also Thornton v. Potamkin Chevrolet, 94 N.J. 1, 8, 462 A.2d 133 (1983) (explaining that fractionalized claims are detrimental to our judicial system); Applestein v. United Board & Carton Corp., 35 N.J. 343, 356, 173 A.2d 225 (1961) (stating that "[t]he sound administration of a judicial system requires that all facets of a single dispute between parties be completely determined in one action").
The Supreme Court recently revisited the scope of the entire controversy doctrine in DiTrolio v. Antiles, 142 N.J. 253, 662 A.2d 494 (1995). Justice Handler, writing for a unanimous Court, framed the issue as "whether a sufficient commonality of facts undergirds each set of claims to constitute essentially a single controversy that should be the subject of only one litigation." Id. at 258, 662 A.2d 494. In examining this issue, the Court first cited Rule 4:30A which provides:
Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of [the]omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by R. 4:64-5 (foreclosure actions) and R. 4:67-4(a) (leave required for counterclaims or cross-claims in summary actions.)
[DiTrolio, 142 N.J. at 266, 662 A.2d 494.]
The Court then determined that the prevailing principle for determining whether different filed claims constitute one controversy is "whether the claims against the different parties arise from related facts or the same transaction or series of transactions." Id. at 267, 662 A.2d 494 (citations omitted). In other words,
[I]f parties or persons will, after final judgment is entered, be likely to have to engage in additional litigation to conclusively dispose of their respective bundles of rights and liabilities that derive from a single transaction or related series of *1079 transactions, the omitted components of the dispute or controversy must be regarded as constituting an element of one mandatory unit of litigation.
[Id. at 268, 662 A.2d 494 (citing O'Shea v. Amoco Oil Co., 886 F.2d 584, 590-91 (3d Cir.1989)).]
The Supreme Court analyzed the DiTrolio case in the framework of the entire controversy doctrine, and held that the plaintiff's suit had to be dismissed. In the plaintiff's second lawsuit, he had to establish and/or rely, in part, on the same evidence as had been presented in his first lawsuit. Id. at 269, 662 A.2d 494. Although the two complaints filed by plaintiff established two different causes of action, the factual basis of both actions was identical. Ibid. Since the defendant-doctors were not named in the first suit, the second suit against them was barred by the entire controversy doctrine. Id. at 273, 662 A.2d 494. Justice Handler concluded that had the plaintiff named the doctors in the first suit, the scope of discovery would have been broadened, thus aiding the ultimate fact-finder to reach a verdict in that litigation. Ibid.
The Court emphasized that "the determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts." Id. at 271, 662 A.2d 494. Although a controversy that originates from a core set of related factual circumstances may trigger different claims against different parties, it is the "commonality of facts, rather than the commonality of issues, parties or remedies that defines the scope of the controversy and implicates the joinder requirements of the entire controversy doctrine." Id. at 272, 662 A.2d 494 (emphasis added).
The Supreme Court has clearly stated that the entire controversy doctrine applies to automobile negligence cases such as those at issue here. See Prevratil v. Mohr, 145 N.J. 180, 678 A.2d 243 (1996). In the case at bar, all the claims presented by the various litigants for personal injuries and the medical providers as assignees should be adjudicated in a single action in the Superior Court.[4] Broadly speaking, the claims that this motion seeks to hold in abeyance can be separated into two distinct groups: first, personal injury actions arising out of the accidents which Allstate asserts were fraudulent, intentional or staged; and, second, claims by medical providers for the payment of PIP benefits to the participants in those accidents.
Allstate seeks to prove that the various accidents listed in the declaratory judgment action were staged in a concerted effort to enable various plaintiffs, claimants and policyholders to assert claims for personal injuries and payment of medical bills.
Allstate represents that, at the time of trial, it will introduce evidence that various ring leaders and/or claimants received money as an inducement to obtain medical treatment. All claimants will have a full right and opportunity to participate in the declaratory judgment action. See Boardwalk Regency v. Square Brighton Corp., 288 N.J.Super. 494, 503, 672 A.2d 1185 (App.Div.1996). Should Allstate prevail at trial, the claimants will be precluded from recovering from Allstate in their personal injury actions and the medical providers, as assignees, may be denied payment of PIP benefits, depending upon the conduct of the insureds, patients and the health care providers.
If the personal injury actions and the arbitration matters are not stayed pending resolution of the underlying declaratory judgment action, Allstate's witnesses will have to appear at arbitration hearings, depositions, and at many trials. Various reconstruction experts, investigating police officers and insurance investigators will have to testify at numerous arbitration hearings and at trial. All individuals involved in the prior accidents who are called to establish a pattern or practice of insurance fraud under the Act will also have to be called.
A stay of all lawsuits and arbitration matters will avoid duplicative litigation and possible inconsistent results. Here, it cannot be disputed that the bases of the various demands for arbitration and personal injury actions arise out of a series of similar sets of *1080 facts; namely, the various alleged fraudulent, intentional or staged automobile accidents. Allstate asserts that based on those facts it is not obligated to (1) defend under the policies of insurance or (2) pay PIP benefits as submitted under these policies. Simply stated, if Allstate were to be totally successful at the time of trial, it would not be obligated to defend its insureds or pay PIP benefits for the various accidents. Furthermore, Allstate may be entitled to recover treble damages, investigative expenses, attorney's fees and costs, N.J.S.A. 17:33A-7b, and the defendant "shall not operate a motor vehicle over the highways of this State for a period of one year from the date of judgment...." L.1997, c. 151, § 9.
If Allstate is not successful at trial, it would be obligated to defend its insureds who were successful and to provide payment for PIP benefits. The ultimate issue in dispute, however, concerns the legitimacy of the accidents. Those accidents form the factual predicate giving rise to both Allstate's declaratory judgment action and the personal injury actions and demands for arbitration. Accordingly, the entire controversy doctrine suggests, if not mandates, that all pending arbitration proceedings and personal injury actions arising out of those accidents should be stayed pending resolution of the underlying declaratory judgment action.
Only in this way can the threefold purpose of the entire controversy doctrine be satisfied. First, the avoidance of duplicative litigation; second, fairness to all parties since all claims would be asserted on notice to all parties; and, finally, the avoidance of inconsistent results. Only in this way can the ultimate determination of the action be "comprehensive, just and conclusive as to all persons implicated in the controversy." DiTrolio v. Antiles, supra, 142 N.J. at 270, 662 A.2d 494 (citation omitted).

IV.
The New Jersey Supreme Court has decreed that "[i]nsurance fraud is a problem of massive proportions that currently results in substantial and unnecessary costs to the general public in the form of increased rates." Merin v. Maglaki, 126 N.J. 430, 436, 599 A.2d 1256 (1992). As the Court observed, as much as fifteen percent of all insurance claims involve fraud. Id. A recent estimate reveals that automobile insurance fraud costs each New Jersey policyholder approximately $160 to $200 per year in increased premiums.[5]
The New Jersey Legislature enacted the Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 to -15, in an effort to aggressively combat the incidences of insurance fraud. The Act seeks to prevent fraud by:
[1] facilitating the detection of insurance fraud,
[2] eliminating the occurrence of such fraud through the development of fraud prevention programs,
[3] requiring the restitution of fraudulently obtained insurance benefits, and
[4] reducing the amount of premium dollars used to pay fraudulent claims.
[N.J.S.A. 17:33A-2; Merin v. Maglaki, supra, 126 N.J. at 436, 599 A.2d 1256.]
The Act authorizes an insurance carrier to assert claims for fraud in the Superior Court. In addition, the Act allows an insurance company "to recover compensatory damages, which may include reasonable investigation expenses, costs of suit and attorneys fees." N.J.S.A. 17:33A-7a. The Act further allows an insurance company that is successful under subsection a to recover treble damages if the court determines that the defendant has engaged in a pattern of violating the Act. N.J.S.A. 17:33A-7b.
The Act designates the proper forum for the adjudication of issues of fraud: "Any insurance company damaged as the result of a violation of any provision of this act may sue therefor in any court of competent jurisdiction...." N.J.S.A. 17:33A-7a (emphasis added). Significantly, the Legislature did not provide for the arbitration of claims under the Act; nor did it give arbitrators the power to award any of the specified damages under the Act. The role of arbitration in automobile insurance matters is to provide for the prompt payment of PIP benefits to ensure that people legitimately injured as a *1081 result of an automobile accident receive reasonable and necessary medical treatment in a prompt and expeditious manner. See Kubiak v. Allstate Ins. Co., 198 N.J.Super. 115, 119, 486 A.2d 879 (App.Div.1984). As Judge Pressler so aptly expressed, "arbitration by its nature does not provide a forum conducive to extensive issue and party joinder or to the according of a variety of remedies." Jersey City Police v. Jersey City, 257 N.J.Super. 6, 14, 607 A.2d 1314 (App.Div.1992).
All actions now pending in the AAA should be stayed until the adjudication of this declaratory judgment action. Although the AAA has jurisdiction over the PIP claims asserted, the arbitration forum is inadequate to handle large cases, such as this, which involve complex fraud issues and interrelated accidents that will require the appearance of multiple parties, witnesses, police officers and insurance investigators. More importantly, any arbitrator who agreed that the participants in an accident had engaged in fraudulent activity would be unable to impose treble damages or investigation expenses or the penalty recently enacted by the legislature:
any person who is either found by a court of competent jurisdiction to have violated any provision of P.L.1983 c.320 (C.17:33A-1 et seq.) pertaining to automobile insurance or been convicted of any violation of Title 2C of the New Jersey Statutes arising out of automobile insurance fraud shall not operate a motor vehicle over the highways of this State for a period of one year from the date of judgment or conviction.

[L. 1997, c. 151, § 9.]
The legislative and judicial mandates to aggressively fight fraud can not be ignored; nor can the strong public policy to curb the rampant and blatant abuses of the so-called "no-fault" system be disregarded. See, e.g., L. 1997, c. 151, § 8 (imposing a $25,000 penalty on any insurer that fails to properly implement an anti-fraud plan). Allstate has clearly established a prima facie case of fraud. Neither a purported insured, passenger nor health care provider can evade the provisions of the Insurance Fraud Prevention Act by preemptively filing an action for arbitration. At this time, the court does not have to determine the effect, if any, of an arbitration award in this subsequent declaratory judgment action in the Superior Court, such as: would the principles of the entire controversy doctrine, collateral estoppel or res judicata be applicable?
Therefore, all other proceedings involving the defendants named in the declaratory judgment action will be stayed, but discovery shall be permitted. The attorney for Clifton Medical Imaging Center, who has not opposed the motion for a stay, properly suggests that the order granting the stay should provide that the stay will toll the statute of limitations for filing or consummating arbitration proceedings. Therefore, the statute of limitations set forth in N.J.S.A. 39:6A-13.1 will be tolled during the pendency of the within matter with regard to: 1) any PIP arbitrations which are stayed by the order herein; 2) any PIP arbitrations which may later be included in the within matter; and 3) any PIP arbitrations not yet filed but for which an accident date is currently set forth in Exhibit "C" in Allstate's moving papers or which may in the future be added to Exhibit "C" or otherwise included in the within matter.
Furthermore, the parties have agreed that the declaratory judgment complaint is hereby deemed to constitute a denial of coverage for the purpose of permitting an interested party claimant to assert an uninsured motorist claim. Therefore, any defendant may move upon due notice and just cause for the right to proceed with uninsured motorist claims.
Lastly, any defendant or interested person[6] may move before this court upon due *1082 notice and good cause to vacate this stay with respect to their lawsuit and/or arbitration.
Motion for a stay of personal injury actions and arbitration is granted but discovery may continue.
NOTES
[1] There are at least 33 other cases alleging similar fraud against more than 5,100 defendants pending in Morris County, including one by Camden Fire Insurance Company against 999 defendants, MRS-L-1035-96. At least seven of the other cases involve more that 400 defendants in each case. This court does not know how many other insurance fraud cases have been instituted in other counties.
[2] In the last few months, local authorities have arrested nearly twenty residents of the Passaic-Paterson area. See Jennifer Van Doren, Arrests in Alleged Auto Insurance Scam, The Bergen Record, June 6, 1997, at 1. Those arrested were charged with theft by deception and conspiracy to commit the same. Id. Specifically, the Passaic County Prosecutor accused those arrested of being "drivers and passengers in nine specific accidents" which he contends were staged. Id. Jose Alphonso Siri and Kathy Gonzalez were also arrested and charged with being the ring's leaders. Joseph D. McCaffrey, Passaic County Raids Net 17 in Giant Auto Insurance Fraud Case, The Star Ledger, June 6, 1997, at 56. Authorities and experts alike agree that the scope of this fraud ring extends beyond the handful of persons already arrested. Melody Peterson, Auto Insurers Say A Ring Defrauded On Big Scale. New York Times, June 5, 1997, at Metro Section, pg. 1; see also Dan Kraut, Key Insurance Scam Suspect Nabbed, Herald News, June 3, 1997 at Al. In fact, this fraud ring is considered the largest ever documented. Dan Kraut, Immigrants Duped Into Insurance Fraud, Herald News, June 5, 1997, at A).
[3] As Joel Mendez, Santos Gonzalez and Andy Catinchi claim.
[4] Obviously, this case may have to be bifurcated into several trials but certainly not 434, considering the few defendants who have appeared in this action.
[5] Jennifer Van Doren, Arrests in Alleged Auto Insurance Scam, Bergen Record, June 6, 1997.
[6] Last night, the court received by fax an objection to permitting discovery to continue, although not objecting to a stay of two personal injury actions in Middlesex County because Allstate had not entered an appearance for a purported insured, Luz Rodriguez. At this time, the court will not consider this objection.