841 A.2d 512 (2003)
366 N.J. Super. 459
NEW JERSEY MANUFACTURERS INSURANCE COMPANY, Plaintiff,
v.
Peggy J. GONSALVES; Bear Apothecary Shoppe, Inc. t/a Morton Barnett, Inc.; St. Lawrence Rehabilitation Center; Central Jersey MRI Group; Edward Von Der Schmidt, M.D.; and St. Francis Medical Center, et al., Defendants.
Superior Court of New Jersey, Law Division, Mercer County.
Decided February 3, 2003.
*513 Patricia Hart McGlone, West Trenton, for plaintiff.
*514 Charles F. Harris, Princeton, for defendant Interested Party Bear Apothecary Shoppe, Inc. t/a Morton Barnett, Inc. (Mason, Griffin & Pierson, P.C.).
Scott I. Unger, Princeton, for defendant Peggy Gonsalves (Stark & Stark, P.C.).
Tara K. Kelly, Princeton, for defendant Interested Party St. Lawrence Rehabilitation Center (Dechert Law Firm).
Alicia A. Zonetti, Lawrenceville, for defendant Interested Parties Central Jersey MRI Group and Edward von der Schmidt, III, M.D. (Fox, Rothschild, O'Brien & Frankel, LLP).
Jennifer E. Troast, Trenton, for defendant Interested Party St. Francis Medical Center (Lenox, Socey, Wilgus, Formidoni, Brown, Giordano & Casey, LLC).
Arnold C. Lakind, Lawrenceville, for defendant Interested Party Trenton Orthopedic Group, P.A. (Szaferman, Lakind, Blumstein, Blader, Lehmann & Goldshore, P.C.).
SABATINO, J.S.C.
The legal issue before this Court is whether an insurance company, upon discovering apparent fraud by its policyholder, has a right to the restitution of funds from innocent medical providers that had supplied goods or services to the policyholder. The issue has not been resolved by our state appellate courts. The Court concludes that an insurer has such a right to restitution, but that the right is qualified by equitable considerations.

I.
In 1982, Peggy Gonsalves applied to plaintiff New Jersey Manufacturers Insurance Company ("NJM") to obtain an automobile insurance policy. In her application with NJM, Ms. Gonsalves listed her residence at 37 Delaware Avenue, Lambertville, New Jersey. NJM approved her application and issued her an automobile policy. The policy was renewed annually, in each year Ms. Gonsalves reaffirming to NJM her apparent New Jersey address.
On January 21, 1987, Ms. Gonsalves was seriously injured in a motor vehicle accident. She was treated by numerous medical providers, including orthopedic physicians, neurologists, plastic surgeons, hospitals, physical therapists, and pain management specialists. Ms. Gonsalves also was prescribed a variety of medications, which she routinely had filled at her local independent pharmacy, the Bear Apothecary Shoppe. Due to the ongoing nature of her injuries, Ms. Gonsalves continued to be treated and to take prescribed medications from 1987 through 2001.
As part of the coverage extended though its automobile policy, NJM provided Ms. Gonsalves with Personal Injury Protection ("PIP") benefits, pursuant to N.J.S.A. 39:6A-1 et seq. From 1987 through 2001 Ms. Gonsalves sought PIP benefits for the treatment, diagnostic tests and prescription drugs that she had received as a consequence of her motor vehicle accident. In her claim forms applying for such PIP benefits, Ms. Gonsalves again represented to NJM that she was a New Jersey resident.
Pursuant to the terms of Ms. Gonsalves' PIP policy, NJM made a series of payments on her behalf to her various medical providers and to the Bear Apothecary Shoppe. According to data supplied to the Court before oral argument, NJM's total payments to the Bear Apothecary Shoppe for Ms. Gonsalves amount to as much as $260,000.[1] In addition, NJM paid comparatively *515 modest sums to other third-party providers, including St. Francis Hospital ($5,804.49), St. Lawrence Rehabilitation Center ($7,187.00), Central New Jersey MRI ($250.00), Edward Von Der Schmidt, III, M.D. ($259.00), and other facilities.
According to NJM, it obtained information in March 2000 indicating that Peggy Gonsalves was a resident of Pennsylvania rather than of New Jersey, and that she had been living in Pennsylvania continuously since the time she first applied for NJM coverage in 1982. NJM also determined that Ms. Gonsalves had failed to disclose that her son, Antone Gonsalves, allegedly had been living with her and had been operating the vehicles insured by NJM during the policy periods at issue. After investigating the matter further, NJM notified Ms. Gonsalves in a letter dated January 21, 2001 that, because of her alleged misrepresentations, it was non-renewing her automobile insurance and that it was denying payment on all of her PIP claims, effective immediately.
On May 17, 2001 NJM filed a complaint for declaratory judgment and for civil damages against Peggy Gonsalves and over forty medical providers, the latter being identified in the complaint as "Interested Parties." The complaint alleges that Ms. Gonsalves, through her alleged material misrepresentations to NJM, violated the New Jersey Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 et seq. Because of that fraud, NJM seeks to void its automobile insurance coverage with Ms. Gonsalves, and to obtain restitution from her for all benefits she received. NJM also seeks an award of treble damages and counsel fees. Additionally, in Count Five of the complaint, NJM independently seeks "reimbursement of all amounts paid on behalf of defendant Peggy J. Gonsalves from Defendant Interested Parties."
With leave of the court, the New Jersey Attorney General filed a complaint in intervention against Ms. Gonsalves on January 4, 2002. Bootstrapping upon the alleged misrepresentations identified by NJM, the State charges Ms. Gonsalves with over a dozen violations of the Insurance Fraud Prevention Act. The State seeks more than $30,000 in civil penalties pursuant to N.J.S.A. 17:33A-5, "full restitution" from Ms. Gonsalves[2], costs and counsel fees, and the suspension of Ms. Gonsalves' driver's license pursuant to N.J.S.A. 39:6A-15. The State also has revealed that the Division of Criminal Justice has opened a file in the matter.
Ms. Gonsalves denies that she made any material misrepresentations to NJM, and contends that her conduct at all times was lawful. She has counterclaimed against NJM, alleging that its actions in withholding further benefits is in bad faith and that its lawsuit against her is frivolous and untimely. Several of the defendant providers have filed answers denying liability; the remainder are either in default or have amicably resolved their differences with NJM.
After some limited discovery was exchanged, this Court heard defense motions to dismiss the case on statute of limitations grounds. On April 29, 2002, the Court issued an order declaring as a matter of law that the statute of limitations applicable to plaintiff NJM, as a private party, is *516 six (6) years, see N.J.S.A. 17:33A-7(e), and that the statute of limitations applicable to the intervenor State is ten (10) years, see N.J.S.A. 2A:14-1.2. The Court noted that those respective limitations periods may be equitably tolled, but held in abeyance such a tolling determination pending further discovery and an evidentiary hearing. See Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973).
In July 2002, Peggy Gonsalves filed a personal bankruptcy petition in the United States District Court. Thereafter, NJM obtained relief from the automatic bankruptcy stay to permit its continued prosecution of claims in this court against the defendant providers. NJM is presently filing a separate petition with the Bankruptcy Court to allow it to pursue its fraud claims in state court against Ms. Gonsalves.
After the Gonsalves bankruptcy filing, this Court held a case management conference. In that conference, the providers' counsel voiced doubts about the propriety of NJM's restitution claims against them, even if NJM could prove fraud on the part of its insured. Recognizing that it could be beneficial to resolve the controlling legal principles at an early stage, the Court invited NJM to file a motion for partial summary judgment, one that would test the viability of NJM's theories against the providers as a matter of law. The Court considered briefs and oral arguments from the parties[3] on these important threshold issues. This opinion ensued.

II.
NJM contends that, if it proves fraud by Ms. Gonsalves, then its automobile insurance policies affording her with PIP coverage are void ab initio. Thus, according to NJM, any benefits that the company paid out under those voided policieseither to Ms. Gonsalves herself or to any third partiesmust be disgorged. Under that analysis, it makes no difference whether the third party payees were unaware of the fraudulent misrepresentations that Ms. Gonsalves allegedly made to her insurer. The third parties were mere assignees of the insured, and, as such, can have no greater rights to benefits that the insured herself.
Conversely, the providers emphasize that they extended medical care to Ms. Gonsalves or filled her prescriptions in good faith, without any reason to believe that her insurance would be retroactively deemed invalid years later. They urge the Court to adopt a rule of law that would allow them to keep any payments that they received from NJM. Rather than seeking reimbursement from innocent providers, the insurer should confine its efforts to pursuing restitution from its defalcating policyholder. By the providers' reasoning, once they have been paid, there should be no looking back.
To date, New Jersey appellate courts have not resolved this issue conclusively. There are two reported cases from the Law Division that are most nearly on point, but they lead to opposite inferences.
On the providers' side of the ledger is Hunt v. Hospital Service Plan of New Jersey, 59 N.J.Super. 219, 157 A.2d 575 (Law Div.), rev'd on other grounds, 33 N.J. 98, 162 A.2d 561 (1960). There, Gilbert Hunt and his wife Emily Hunt had obtained health coverage through defendants Hospital Service Plan of New Jersey (then known as "Blue Cross") and Medical-Surgical Plan of New Jersey ("Blue Shield"). Id. at 221, 157 A.2d at 576. The policies *517 excluded coverage for medical care compensable under the "workmen's" (worker's) compensation laws. Id. at 222, 157 A.2d at 576-77. Mrs. Hunt was injured at work, resulting in her being hospitalized and receiving care from several physicians. Id. at 221, 157 A.2d at 576. Unaware initially that the wife's treatment had arisen out of a work-related accident, Blue Cross and Blue Shield reimbursed the Hunts for some of the associated medical bills. Id. at 221-22, 157 A.2d at 576-77. In making those partial payments, the insurers had relied upon Mrs. Hunt's hospital records, which apparently had not mentioned that she had been injured at work. Id. at 222, 157 A.2d at 576-77.
Nineteen months after Mrs. Hunt's accident, the compensation court ruled that her employer was not responsible for her medical and hospital bills. Hunt, 33 N.J. at 100, 162 A.2d at 562. It reached that result because Mrs. Hunt had obtained treatment without adhering to the procedures, mandated by the worker's compensation laws, for requesting her employer to provide those services in the first instance. Id. at 101, 162 A.2d at 562-63. Mr. Hunt thereafter sued Blue Cross and Blue Shield in the Superior Court on the medical bills that remained unpaid. Hunt, 59 N.J.Super. at 221, 157 A.2d at 576. The defendant insurers filed counterclaims against the Hunts, seeking reimbursement on the partial payments they had made before discovering the work-related nature of the injuries. Ibid.
The Law Division in Hunt treated the unpaid sums, being sought by the insureds, differently from the payments that their health insurers had already made. Id. at 222-26, 157 A.2d at 576-79. As to the former, the trial court found that the Blue Cross and Blue Shield policy documents in question clearly excluded medical services that could have been covered under an employer's worker compensation plan. Id. at 224, 157 A.2d at 577. Having failed to pursue that remedy in a proper fashion against Mrs. Hunt's employer, the Hunts could not obtain alternative recourse from her health insurers. Ibid. That result "may be somewhat harsh," the trial judge in Hunt observed, but "[t]he court has no choice but to interpret the contract according to the plain meaning of the words which bind the contract." Ibid.[4]
Nonetheless, the trial judge in Hunt rejected the counterclaim of Blue Cross[5] for restitution. Id. at 224-26, 157 A.2d at 577-79. The court recognized that, in general, one who pays money under a mistake of fact may be entitled to recover the payment. Id. at 225, 157 A.2d at 578. That rule is tempered, however, by what the court described as "equitable principles." Ibid. (citing Great American Ins. v. Yellen, 58 N.J.Super. 240, 156 A.2d 36 (App.Div.1959)). Upon reviewing the facts as a whole, the court concluded in Hunt that it would have been "inequitable and... contrary to public policy" for Blue Cross to recover the payments it had made to the husband and wife. Id. at 226, 157 A.2d at 579. The court noted that in making those payments, the defendant insurers had been "well aware of the obvious deficiency" in the billing records, and that the missing information was "readily obtainable." *518 Id. at 225, 157 A.2d at 578. The court characterized this oversight as "not a mere mistake of fact," but one bespeaking "a high degree of fault." Ibid. The Hunts, meanwhile, had not acted in bad faith, having no affirmative obligation to volunteer the workplace information to the defendants. Ibid.
Although a provision in the Hunts' insurance contract authorized Blue Cross to recoup payments made in error, the court found that public policy considerations weighed against strict enforcement of that provision:
The [insurers'] contractual clause cannot be applied in derogation of public policy. If applied in this peculiar situation, it is an open invitation to insurance companies to relax their diligence in ascertaining facts. Beneficiaries of insurance contracts would be made to feel falsely secure and would rely on such payment by inaction. [Ibid.]
Further, the court did not require the insureds to demonstrate specific reliance upon the monies they had received:
There is no positive showing here that plaintiff changed his position based on the payments of Blue Cross, but it must be noted that such a showing is difficult to present. The usual result of payment would be to induce inaction by instilling a sense of security. Such inaction could very well be as much a change of position or reliance as would be a positive act. [Ibid.]
Based on those considerations of equity and public policy, the court refused to allow Blue Cross to recover its mistaken payments from the Hunts. Ibid.
A contrary result is suggested, as least in dicta, by a more recent Law Division case, Allstate Insurance Company v. Lopez, 325 N.J.Super. 268, 738 A.2d 987 (Law Div.1999) (also known as "Lopez II"). Lopez involved "one of the largest automobile accident fraud rings documented in Unites States history." Id. at 272, 738 A.2d at 988. The participants in the ring filed hundreds of personal injury lawsuits and PIP arbitrations, seeking recovery from Allstate out of a variety of allegedly fraudulent circumstances. Ibid. The conspiracy was said to involve staged accidents, non-existent injuries, and drivers with bogus insurance credentials. See Allstate Ins. Co. v. Lopez, 311 N.J.Super. 660, 669-73, 710 A.2d 1072 (Law Div.1998) ("Lopez I"). Many of the injuries involved were "diagnosed and treated in essentially the same manner by the same health care providers," id. at 669, 710 A.2d at 1076, and Allstate contended that some of the ring leaders or claimants "received money as an inducement to medical treatment." Id. at 675, 710 A.2d at 1079. The defendants included some 434 insureds, drivers, passengers and health care providers, all of whom were charged with violations of the New Jersey Insurance Fraud Prevention Act. Id. at 662, 710 A.2d at 1073.
Several of the claims in Lopez involved Allstate automobile policies issued to fictitious persons named "Siber Rodriguez" and "Eric Dominguez." Lopez II, 325 N.J.Super. at 273-78, 738 A.2d 987. At Allstate's request, the trial court voided all coverage under the policies that had been issued in the names of those imposters. Id. at 278-79, 738 A.2d at 989-92. In voiding the policies, the trial court in Lopez II expressly insulated Allstate from claims by any supposed policy beneficiaries or their assignees. Id. at 277, 738 A.2d at 991. The court observed that such claimants were "not innocent," given "their misrepresentations and participation in a broader conspiracy to commit fraud against Allstate." Id. at 276, 738 A.2d at 991.
One of the defendants in Lopez II was the Hackensack University Medical Center, *519 a hospital that had rendered medical treatment to some of the members of the fraud ring. Id. at 278, 738 A.2d at 992. The hospital was named in the complaint simply as a defendant medical provider. Significantly, Allstate did not seek any relief against the hospital. Ibid. Reciprocally, the hospital had not asserted any counterclaim against Allstate or pressed any affirmative rights as an assignee. Ibid. Nevertheless, the trial judge observed the following:
Even if the hospital were an assignee, it may not claim a position stronger than the one its assignor could assert. The defenses available against an assignor are available against his assignee. Brooklawn v. Brooklawn Housing Corp., 129 N.J.L. 77, 79, 28 A.2d 199[, 201] (Err. & App.1942); Restatement (2d) of Contracts, sec. 336(1) (1981); Ringwood Assoc. Ltd. v. Jack's of Route 23, Inc., 153 N.J.Super. 294, 311, 379 A.2d 508[, 516-17] (Law Div.1977), aff'd, 166 N.J.Super. 36, 398 A.2d 1315 (App. Div.1979); Tirgan v. Mega Life & Health Ins., 304 N.J.Super. 385, 391, 700 A.2d 1239[, 1241-42] (Law Div.1997) (physician's rights as assignee of patient's health insurance policy could rise no higher than patient's rights under policy).

[Ibid.]
The trial court's opinion does not indicate whether Hackensack University Medical Center had received any payments from Allstate for the suspect patients, and, if it had, whether Allstate had tried to recoup those funds. NJM argues here that the dicta in Lopez II quoted above, as well as the case's overall logic, requires the medical providers for Ms. Gonslaves to disgorge any benefits they received from NJM as mere assignees of her insurance policy.
Neither Hunt nor Lopez precisely applies to this case. Unlike Hunt, the present motion deals with payments received by assignees of an insured, not by the insured herself. Also, Hunt did not involve an insured who had engaged in conduct alleged to be fraudulent. Likewise, Lopez is not dispositive because the insurer there did not seek any relief against the innocent medical provider, i.e., the hospital which had treated the putative insureds. The insurer in Lopez was only relieved of making future payments once the fraud was uncovered. Thus, neither case squarely resolves NJM's claims for restitution against innocent medical providers. Further, as Law Division cases, neither opinion binds this Court in any event.
Other New Jersey insurance cases offer divergent results in fact patterns that do not directly parallel the present situation. For instance, in Tirgan v. Mega Life and Health, 304 N.J.Super. 385, 700 A.2d 1239 (Law Div.1997), a case cited in Lopez II, a treating physician was held limited, as an assignee of benefits under his patient's health carrier, to recover from the insurer no more than the maximum customary charges authorized by the insurer's contract. Although Tirgan does espouse the general principle that a physician-assignee can have no greater rights than his patient-assignor, see id. at 391-92, 700 A.2d at 1241-42, the case did not involve any restitution claims by the insurer against the physician.
Another insurance case cited in Lopez II, Great American Insurance Co. v. Yellen, 58 N.J.Super. 240, 156 A.2d 36 (App. Div.1959) did involve restitution. The plaintiff insurer there alleged that, as the result of a clerical oversight, it had mistakenly paid in full an insured's claim on a fire loss. Id. at 242, 156 A.2d at 37. The Appellate Division remanded the case for a new trial because the trial court had improperly *520 excluded the insurer's proofs of mistake. Id. at 247, 156 A.2d at 40. In articulating the basic legal principles involved, the Appellate Division stated:
It is the general rule that one who has paid money under a mistake of fact but for which payment would not have been made may have restitution from the payee notwithstanding that the mistake was unilateral and a consequence of the payor's negligence, providing, however that such restitution will not prejudice the payee.
[Id. at 244, 156 A.2d at 39.]
On its facts, Yellen is of little consequence here because it involved neither a claim of fraud by the insured, nor did it concern an insurer's right to the recoupment of funds from an innocent provider.
By comparison, fraud was involved in Material Damage Adjustment Corp. v. Open MRI of Fairview, 352 N.J.Super. 216, 799 A.2d 731 (Law Div.2002). The defendant in that case, a provider of magnetic resonance imaging (MRI) services, was held liable to reimburse an automobile insurance company for PIP payments. Id. at 233-34, 799 A.2d at 742. The defendant had received the payments for services performed during a two-year period when it lacked a license with the State Department of Health. Id. at 220-21, 799 A.2d at 733-34. The court described the provider's decision to operate the MRI facility without the required license as "clearly the product of arrogance." Id. at 227, 799 A.2d at 738. The court also found that the defendant had violated the Insurance Fraud Prevention Act by misrepresenting its authority to operate in hundreds of written insurance claims. Id. at 230-31, 799 A.2d at 740-41. Given the provider's multiple regulatory violations, the trial court had no hesitation in requiring it to pay back its ill-gotten gains. Id. at 231-33, 799 A.2d at 740-42. Here, of course, there is no allegation that Ms. Gonsalves' providers engaged in any regulatory violations.
Some limited guidance is also offered by rescission cases in New Jersey involving injured automobile passengers or members of an insured driver's household.
In Fisher v. New Jersey Automobile Full Insurance Underwriting Ass'n, 224 N.J.Super. 552, 540 A.2d 1344 (App.Div. 1988), a car owner applied for insurance but failed to register his vehicle. Thereafter, a passenger in the unregistered car was injured in a collision with another vehicle. Id. at 554, 540 A.2d at 1345-46. The passenger, who had no coverage of her own, sought PIP benefits from the car owner's insurer. Id. at 554-55, 540 A.2d at 1345-46. The insurer balked, contending that its policyholder's failure to register the car voided the policy ab initio as to both the policyholder and any beneficiaries of the policy. Id. at 555, 540 A.2d at 1345-46. The Appellate Division disagreed, holding that the legislative purposes of the No-Fault Law would be disserved by depriving the innocent passenger of coverage. Id. at 557-59, 540 A.2d at 1347-48.
Likewise, in State Farm Mut. Auto. Ins. v. Wall, 92 N.J.Super. 92, 222 A.2d 282 (App.Div.1966), the court voided an automobile policy because of misrepresentations by its insured, but declared the policy non-cancelable as to the third parties who were injured by the insured's vehicle. The court found that because the insurer, State Farm, had relied upon the applicant's false statements about his prior driving record, it could rescind the policy. Id. at 97-98, 222 A.2d at 285-86. However, the court declined to deprive the innocent third parties who had been injured of the insurance benefits bestowed upon them by statute. Id. at 103-04, 222 A.2d at 289-90.
In a similar vein, the Appellate Division in Allstate Insurance Co. v. Meloni, 98 *521 N.J.Super. 154, 236 A.2d 402 (App.Div. 1967), upheld the denial of benefits to a policyholder injured in a two-car accident, where the policyholder had failed to disclose in her automobile insurance application that her husband's driver's license had been previously suspended. The court distinguished the insurer's non-liability to its insured (Mrs. Meloni) from its potential liability to the persons (Joseph Munger and Nicola Rubino) who had been in the other vehicle:
While Munger and Rubino would have been entitled to stand in the shoes of the Melonis as to any rights of the latter against Allstate under the policy, it does not follow that defendants are entitled to stand in the shoes of Munger and Rubino as to such rights as they may have to recover under the policy. While we specifically refrain from deciding the point, in the event that plaintiff [Allstate] were to be found liable to Munger and Rubino..., the terms of the policy required that defendants [the insureds] reimburse Allstate for such sums as it would be required to pay out in satisfaction of their liability [Id. at 162, 236 A.2d at 407.]
Conversely, the Appellate Division in Tucker v. Allstate Insurance Co., 195 N.J.Super. 230, 478 A.2d 1220 (App.Div. 1984), and later in Lovett v. Lazaroff & Co., 244 N.J.Super. 510, 582 A.2d 1274 (App.Div.1990), denied coverage under policies that were voided ab initio because the applicant for insurance in each case had failed to tender a valid check for the premium. In Tucker, the plaintiff was injured while driving a rental car. Tucker, 195 N.J.Super. at 233, 478 A.2d at 1221. He had applied for insurance on his personal car through Motor Club of America but the check was returned for insufficient funds. Id. at 232-33, 478 A.2d at 1220-21. He made a claim for PIP benefits under his mother's automobile policy with All-state, which Allstate paid. Id. at 233, 478 A.2d at 1221. When Allstate tried to get pro rata reimbursement from MCA, MCA refused. Ibid. The court held that the MCA policy was void from inception despite the fact that no notice of cancellation had been sent to the insured. Ibid. However, the court noted that no third party had made any claim arising out of the accident. Ibid.
In Lovett the court emphasized that the claim at issue was that of the policyholder's son, for injuries which he had sustained while occupying another person's vehicle. Lovett, 244 N.J.Super. at 511-13, 582 A.2d at 1274-76. The court found that "[h]is claim is not that of an innocent third party injured as the result of the operation of the insured vehicle, but rather that of an additional insured seeking to recover under the terms of a void contract." Id. at 513, 582 A.2d at 1276.
Very recently, the Supreme Court in Palisades Safety & Insurance Ass'n v. Bastien, 175 N.J. 144, 814 A.2d 619, (2003), aff'g, 344 N.J.Super. 319, 781 A.2d 1101 (App.Div.2001), upheld the denial of PIP benefits to a wife, not declared on the insurance policy, who had been injured while driving her husband's insured vehicle. The insurer filed a declaratory judgment action to declare the policy void ab initio and avoid any PIP liability. Id. at 147, 814 A.2d at 621. The Court agreed with the lower courts that the insurer could rescind the policy on the vehicle, as to the husband insured, because the husband, in applying for coverage, had falsely represented to the insurer that he was single and that there were no other drivers in his household. Id. at 149, 814 A.2d at 622-23. In reaching its result, however, the Court distinguished the resident spouse's circumstances from those of innocent claimants who might otherwise deserve *522 PIP coverage in other fraud cases. Id. at 150-51, 814 A.2d at 623-24.
The Court noted in Bastien that the wife was "in a unique position to be aware of the other spouse's interactions with the insurer of the household's vehicles." Id. at 151, 814 A.2d at 623. Given the household relationship, the Court found it contrary to public policy to permit the wife to collect from her husband's defrauded insurer:
Responsible adults should inform themselves in respect of important insurance-related matters pertinent to their household, and should be encouraged to do so. The strong public policy against the proliferation of insurance fraud favors treating a resident spouse in [the defendant wife's] position as her husband, that is, entitled to first-party coverage only, when available. The facts here are distinguishable from those cases involving true third parties who were allowed to recover under a void policy. [Id., 814 A.2d at 623-24 (emphasis added) (citations omitted).]
Here, of course, the medical providers who treated NJM's insured Peggy Gonsalves were not part of her household, and arguably were not in a "unique position" to be aware of her interactions with NJM when she applied for and renewed her auto insurance. Nor, on the other hand, are the providers' automobile passengers or other third parties who are legislatively protected for their bodily injuries. Hence, the assorted holdings in the cases cited above involving household members and third parties with bodily injuries, do not settle the providers' rights and duties in this case.
The text of the New Jersey Insurance Fraud Prevention Act also fails to offer a clear solution. To be sure, the statute does allow any insurer damaged as the result of a violation of the Act to sue "to recover compensatory damages." N.J.S.A. 17:33A-7(a). And the purpose of the Act is to combat insurance fraud "aggressively," see N.J.S.A. 17:33A-2, by, among other measures, "requiring the restitution of fraudulently obtained insurance benefits." Ibid.; see also Bastien, at 152, 814 A.2d at 624. (underscoring "the salutary efforts being made in this State to deter insurance fraud in all contexts"). However, the Act contains no express provision authorizing an insurer victimized by its policyholder's fraud to recoup monies that the insurer had paid to innocent medical providers who had supplied goods and services to the policyholder in good faith.
The pertinent case law in other jurisdictions is split. See generally, Donald M. Zupanec, Annotation, Right of Insurer Under Health or Hospitalization Policy to Restitution of Payments Made Under Mistake, 79 A.L.R.3d 1113 (1977). Some cases support the notion that an insurer is entitled to restitution of any funds that it paid out erroneously, including those paid to an assignee of the insured. See, e.g., Pyramid Life v. Masonic Hosp. Assoc., 191 F.Supp. 51 (D.Okla.1961) (applying Oklahoma law, court held that insurer was entitled to recover funds mistakenly paid to hospital association); Aetna Life Ins. Co. v. Nix, 85 N.M. 415, 512 P.2d 1251 (1973) (suggesting that insurer may seek restitution from hospital of funds that the insurer mistakenly paid to it pursuant to an assignment of benefits from the insured). A more substantial number of cases have denied such restitution, at least in circumstances where it would lead to an inequitable result. Cf. City of Hope Nat'l Med. Ctr. v. Superior Court, 8 Cal.App. 4th 633, 10 Cal.Rptr.2d 465 (1992) (insurer not entitled to obtain reimbursement from hospital of benefits paid for insured's cancer treatment, absent proof of fraud by the hospital); Time Ins. Co. v. Fulton-DeKalb Hosp. Auth., 211 Ga.App. 34, 438 S.E.2d *523 149 (1993) (health insurer denied reimbursement of $181,198 in medical benefits it had paid to hospital before discovering that its insured was burned in the course of committing arson); St. Mary's Med. Ctr. v. United Farm Bureau Family Life Ins. Co., 624 N.E.2d 939 (Ind.Ct.App.1993) (innocent medical services provider did not have to reimburse health insurer for payments mistakenly made under patient's lapsed insurance policy); Federated Mutual Ins. v. Good Samaritan Hosp., 191 Neb. 212, 214 N.W.2d 493 (1974) (hospital not required to refund overpayments to insurer where hospital had made no misrepresentations and had acted in good faith, and where the overpayment was solely due to insurer's mistake); Lincoln Nat'l Life Ins. v. Brown Schs., Inc., 757 S.W.2d 411 (Tex. Ct.App.1988) (health insurer denied restitution of payments from hospital for care provided after patient's policy had expired).
General principles of the law of mistake and of the law of restitution further suggest that courts should consider the relative equities in these matters.
As to mistake, section 154 of the Restatement (2d) of Contracts instructs that a party to a contract "bears the risk of mistake when (a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge... or (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." Restatement (2d) of Contracts, § 154 (1981). The Court therefore has a recognized default role in allocating risk. Consistent with these principles, the Appellate Division has noted that "unilateral mistake of a fact unknown to the other party is not ordinarily grounds for avoidance of a contract," and that "the mistake must have occurred notwithstanding the exercise of reasonable care by the party making the mistake." Intertech Assocs., Inc. v. City of Paterson, 255 N.J.Super. 52, 59-60, 604 A.2d 628, 632 (App.Div.1992).
As the Nebraska Supreme Court observed in ruling for the innocent hospital payee in Federated Mutual v. Good Samaritan, supra, 214 N.W.2d at 494 (quoting 114 A.L.R. 384 (1938)), an insurer's "recovery of payments made under a mistake of fact does not apply where, as the result of a mistake or fraud between the original parties, money is paid by one of them on account of the other to a third party...who receives the same in good faith without knowledge of the mistake or fraud, in payment of a claim by him against the latter." These established principles offer the Court justification for examining the totality of circumstances and assessing, absent an express agreement between a provider and a patient's insurer to assign the risk of fraud, whether that risk is borne more fairly by the provider or by the insurer.
Restitution doctrines also invite courts to make assessments of the relative equities affected by an insurer's demands for recoupment. Section 14(1) of the Restatement of Restitution states, in pertinent part, that "a creditor of another...who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefore, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake." Restatement of Restitution, § 14(1) (1937).
Illustration 10 of that provision applies the concept to a situation rather analogous to the one at hand:
A insures his house with B insurance company. A sets fire to the house and thereafter assigns his claim against B to *524 C who pays value therefore. With no reason to know of the incendiarism, C receives payment from B. B is not entitled to restitution from C.

[Id. at Illustration 10.]
Here, Ms. Gonsalves arguably stands in the shoes of "A" in the Illustration; NJM arguably resembles "B"; and the innocent medical providers, having supplied A with the "value" of their services, arguably fit the role of "C". Accord H. John Homan Co. v. Wilkes-Barre Iron & Wire Works, 233 N.J.Super. 91, 558 A.2d 42 (App.Div.1989) (plaintiff, a general contractor, was barred from obtaining restitution of a payment it had erroneously made to a bank, where the bank had been assigned the payment from plaintiff's subcontractor through an arms-length transaction and had no prior notice of the general contractor's setoff rights).
Given these varied principles, the court finds that the all-or-nothing rules respectively advocated here by NJM and the medical providers, are unpersuasive. If, as NJM argues, it has an absolute right to restitution from third parties whenever a policyholder is shown to have misled the insurer in its coverage documents, such a remedy is likely to inflict considerable harm on innocent payees who had no reason to be aware of the fraud and who are apt to have relied upon the payments they have received. Granting insurers such an unfettered right of restitution could also produce untoward public policy consequences, possibly discouraging medical providers from treating persons who are dependent upon insurance benefits. On the other hand, the providers' extreme contention that they should be able to retain in perpetuity any funds paid by their patients' insurers from the instant such funds are disbursed, is also unsound. Such an inflexible rule would allow payees to be unjustly enriched through, for example, overpayments caused by clerical errors of the insurer, even if such an error is promptly discovered and reported to the payee.
In lieu of any bright-line rule, the court believes that the proper approach is to examine the totality of circumstances involving the insurance company, its policyholder and the medical providers in the specific case where restitution is sought. Several factors should guide a court in that examination, factors which are identified and analyzed in detail in Part III below.

III.
To ascertain whether the totality of circumstances warrant restitution in these contexts, this Court believes that the following matters should be considered:
(1) the time elapsed from the provider's receipt of payment to the insurer's demand for repayment;
(2) the size and frequency of payments;
(3) the nature of the mistake or fraud, and whether it concerns some impropriety or inadequacy in the provider's goods or services;
(4) whether the provider reasonably should have known about the mistake or fraud at the time it accepted payment;
(5) whether the insurer reasonably should have known about the mistake or fraud at the time it rendered payment;
(6) any promises, assurances or other statements made by the insurer to the provider;
(7) whether the insurer or the provider has a clearly superior ability to recover its losses from the policyholder;
(8) the public interest, and the interests of any third parties that may be affected;
*525 (9) any other facts or circumstances that indicate the presence or absence of justifiable reliance by the provider.
The court does not conceive of these factors as having equal weight, or that they are to be applied mechanically. Rather, they offer a method of evaluating the comparative equities in an orderly and comprehensive fashion. The Court now considers the present case with these factors in mind.
First, the lapse of time from NJM's payments to its initial repayment demands in 2001 is enormous. NJM paid for Ms. Gonsalves' medical bills and prescription drugs for nearly fifteen years before it sought any recoupment. Even assuming, arguendo, that NJM can prove that its claims are timely under the statute of limitations, the passage of time nevertheless has major equitable consequences for the innocent providers who were paid by NJM long ago. NJM's last paid invoice from defendant St. Lawrence Rehabilitation was in 1989, from St. Francis Medical Center in 1993, and from Dr. Von Der Schmidt in 1995. To resurrect those dormant accounts now would create disruption and business uncertainty.
Second, the size and frequency of NJM's payments weigh in favor of the providers, especially Bear Apothecary. The record shows that NJM paid Bear Apothecary on at least one hundred discrete claims that were submitted by that drug store over a period of more than a decade. Such pattern of repeated payments would reasonably induce reliance by the recipient. The recipient would naturally gain confidence that its customer had valid insurance, as each successive claim is submitted to the insurance company and paid. As the court noted in Hunt, "[b]eneficiaries of insurance contracts [receiving such payments] would be made to feel falsely secure and would rely on such payments by inaction." Hunt, supra, 59 N.J.Super. at 226, 157 A.2d 575.
Third, the fraud or mistake involved here has nothing to do with the quality or propriety of the prescription drugs and medical services supplied to Ms. Gonsalves. NJM alleges that Ms. Gonsalves fraudulently misrepresented her state of residency in her insurance policy forms. That residency issue has no bearing on the goods or services supplied by her medical providers and her local pharmacy. By comparison, this is not a situation where the providers are alleged to have over-treated or over-billed the insured patient.[6] The fraud, if proven, stems from a geographical matter totally divorced from the bona fides and the goods and services that were extended.
Fourth, NJM does not allege that the provider defendants knew or should have known about Ms. Gonsalves' alleged residency fraud when they accepted payments from NJM. Even if, for example, her local druggist or family physician had reason to think she was living in Pennsylvania, they would not ordinarily know how Ms. Gonsalves had represented her residency *526 on her NJM insurance application and her policy renewal forms.
Fifth, the court cannot tell from the present record whether NJM knew or reasonably should have known about the supposed fraud sooner.[7] This issue is one that would be evaluated at an evidentiary hearing on the statute of limitations, if necessary. For purposes of its restitution analysis here, the court will give the benefit of doubt to NJM and presume that the insurer did not discover the fraud, and could not have discovered it, until the time NJM claimed it found it out in the year 2000.
Sixth, the present record before the court does not document any promises, assurances or other statements made by NJM to the defendant providers. At oral argument on this motion, counsel for Bear Apothecary represented that NJM did make certain assurances to the pharmacy as Ms. Gonsalves' bills continued to mount. The court does not consider that contention here, but again will assume for the purposes of this motion that no such assurances were extended.
Seventh, it would appear from the record that neither NJM nor the providers have any clearly superior advantage in seeking recourse against Ms. Gonsalves. As noted above, Ms. Gonsalves is in bankruptcy proceedings. Although NJM is in the process of moving for relief from the automatic bankruptcy stay, that procedural relief, even if granted, may not result in any practical benefit should the policyholders prove to have few or no assets. If, indeed, Ms. Gonsalves obtained medical treatments and had prescriptions filled under false pretenses, then both NJM and the innocent providers would be victims of the fraud. Each would have the right to be repaid by the defrauding party for the damages caused. There is no reason to think that either class of victim is better situated to pursue the alleged defrauder.
Eighth, the court considers the public interest, and the interests of third parties. To be sure, our State has a strong public interest in deterring insurance fraud. The State's high insurance rates are, in part, the result of fraudulent claims and practices. However, the court must also consider the public interest in access to affordable prescription drugs and medical care. If courts were to grant insurers an unqualified right of restitution from innocent medical providers and pharmacies, such a rule might produce undesirable consequences for the public at large. For example, as previously noted, medical providers might be reluctant to serve insured patients or customers, or insist on up-front cash payments. Or providers, fearful of restitution claims from insurers years after being paid, may have to raise their own prices to guard against such future exposures. Such practices could harm the interests of law-abiding insured patients.
Finally, the Court considers the providers' reliance based upon the record as a whole. Even if additional discovery proves that NJM could not have spotted Ms. Gonsalves' residency fraud sooner and that it never made any assurances to her providers, the balance of the undisputed facts overwhelmingly favors the denial of NJM's restitution claims. The providers simply had no reason to expect NJM to come knocking on their doors in the year 2001 and take back funds that NJM paid to them many years before. Unlike in Lopez, the providers here were not the part of any fraud ring. They had no inkling that *527 Ms. Gonsalves may have misled NJM about her residency. They had every reason to count on keeping the payments they received. The equities weigh heavily in their favor.
With the limited exception of NJM's continued payments to Bear Apothecary[8] after it rescinded Ms. Gonsalves' coverage on January 21, 2001, there is no need for further discovery and judicial review of the circumstances. Although none of the providers formally cross-moved for summary judgment, the Court will impute such cross-motions from the substantive arguments raised by their counsel. In the interests of judicial economy, there is no need to prolong the litigation against them, at least regarding NJM's attempted recoupment of payments made prior to January 21, 2001.
Accordingly, the court denies NJM's motion for partial summary judgment, finding that NJM's legal theories for obtaining restitution from the defendant medical providers of its pre-January 2001 payments simply are not viable. The imputed cross-motions for summary judgment are granted, dismissing all of NJM's restitution claims except those relating to payments it made after January 21, 2001.[9] Counsel for NJM and Bear Apothecary will confer with the court to establish a schedule to complete discovery regarding those lingering claims.[10] Once that discovery is completed, the parties may return to the court to have those payments and the surrounding circumstances assessed under the multi-factor analysis set forth in this opinion.
NOTES
[1] The record indicates that through 1992, Ms. Gonsalves paid the Bear Apothecary Shoppe directly for some or all of her accident-related prescriptions and was reimbursed by NJM; thereafter it appears that NJM paid the pharmacy directly. NJM contends that those direct payments exceed $260,000; Bear Apothecary Shoppe contends that they total $170,000 or less. The mathematical discrepancy does not affect the Court's legal analysis below.
[2] Unlike NJM, the State seeks no monetary relief from the defendant providers.
[3] The Attorney General declined to take a position on the pending issues between NJM and the defendant providers, and did not participate in the oral argument.
[4] On appeal, the Supreme Court reversed that aspect of the trial court's analysis and found that the benefits at issue were not, in fact, "compensable," under the language of the exclusion clause in the Blue Cross policy. Hunt, 33 N.J. at 102-08, 162 A.2d at 563-67. The Supreme Court's ruling left intact the trial court's rejection of Blue Cross' counterclaim for recoupment.
[5] Blue Shield withdrew its own counterclaim at oral argument, for reasons not disclosed in the reported decision. See id. at 221, 157 A.2d at 576.
[6] The court does note that the total costs of the prescriptions filled at Bear Apothecary by Ms. Gonsalves are considerable, whether the correct amount approximates $170,000 or $260,000. The record does not reveal what kinds of medications in this matter were prescribed. In general, Ms. Gonsalves' pharmacy bills ran from $2,000 to $3,000 per month from late 1995 through the middle of 2000. At other times the amounts fluctuated. But there is no allegation in NJM's lawsuit that Ms. Gonsalves was abusing those drugs or that her doctors were over-prescribing her medications. Nor does NJM allege that Bear Apothecary should have been alert to any pharmacological misuse. Had such abusive practices been alleged here by NJM, the equities of its restitution claims would be very different.
[7] Defendant Gonsalves contends that NJM was well aware of her residency as early as 1987, having at that time allegedly obtained photos of her damaged automobile parked in her driveway. The Court ignores that contention for purposes of this motion, viewing the record in a light most favorable to NJM.
[8] The record indicates that there were some communications between NJM and Bear Apothecary representatives after January 21, 2001 about the situation, which led to NJM thereafter making additional payments to the pharmacy in 2001 and 2002. It is unclear if those payments were conditional in nature. Further discovery is needed to explore the parties' respective understandings regarding those payments after NJM's claims of fraud had surfaced.
[9] This disposition does not disturb, of course, any settlements reached between NJM and any of the defendants before today.
[10] The providers' request for sanctions under the frivolous suit provision, R. 1:4-8, is denied. The Court finds that NJM, despite its failure to prevail on its motion, had advanced "a non-frivolous argument for the extension, modification or reversal of existing law or the establishment of new law." R. 1:4-8(a)(2).